IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| F.H.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO. 23-261 |
| Commissioner of Social Security[2] | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                         November 18, 2024

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Therefore, I remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on June 25, 2020, alleging disability beginning on June 24, 2020, due to anxiety, depression, and tachycardia. Tr. at

---

[1]Consistent with the practice of this court, to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her initials. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

66, 227, 251.[3]  Her application was denied initially and on reconsideration.  Id. at 67-79,

81-101.  An administrative hearing was held before an ALJ on December 2, 2021, id. at

39-65, and on December 23, 2021, the ALJ issued an unfavorable decision, finding that

Plaintiff was not disabled.  Id. at 4-16.  The Appeals Council denied Plaintiff's request

for review on November 18, 2022, id. at 22-24, making the ALJ's December 23, 2021

decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action on January 20, 2023.  Doc. 1.  The matter is now

fully briefed and ripe for review.  Docs. 7, 8, & 11.[4]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v.

---

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found and the Certified Earnings Record confirms that Plaintiff is insured through December 31, 2024. Tr. at 4, 242.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 5.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 102 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.    Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.    If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.    If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

III.    **DISCUSSION**

A.    **ALJ's Findings and Plaintiff's Claims**

In the December 23, 2021 decision under review, the ALJ found at step one that

Plaintiff has not engaged in substantial gainful activity since June 24, 2020, the alleged

onset date.  Tr. at 6.  At step two, the ALJ found that Plaintiff suffers from the severe

impairments of tachycardia, depressive disorder, anxiety disorder, and panic disorder.  Id.

At step three, the ALJ found that Plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the Listings.  Id. at 7.

As part of the step-three analysis, the ALJ found that Plaintiff has moderate limitations in

the functional areas of interacting with others, concentrating, persisting, and maintaining

pace, and in adapting or managing oneself, and mild limitations in the area of

understanding, remembering, or applying information.  Id. at 8.

The ALJ determined that Plaintiff retains the RFC to perform a full range of work

at all exertional levels, but with the following non-exertional limitations: never climb

ladders, ropes, or scaffolds; occasionally do all other postural activities; no exposure to

machinery, heights, or vibration, and exposure to only moderate noise; simple, routine

tasks; simple work-related decisions; no contact with the public; occasional contact with supervisors and co-workers; and occasional changes in the work setting. Tr. at 9. Based on the testimony of a vocational expert ("VE"), the ALJ found at step four that Plaintiff cannot perform any past relevant work, id. at 14, and at step five that she could perform other jobs that exist in significant numbers in the national economy, such as linen room attendant, laundry folder, and inspector for surgical instruments. Id. at 14-15. As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 15-16.

Plaintiff argues that the ALJ erred by (1) failing to consider a treating physician's opinion, (2) improperly evaluating the expert medical opinion evidence, and (3) failing to incorporate all of Plaintiff's limitations into her RFC assessment. Doc. 7 at 4-29; Doc. 11 at 1-10. Defendant responds that the ALJ's decision is supported by substantial evidence. Doc. 8 at 6-18.

**B.    Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on September 15, 1995, and thus was 24 years of age at the time of her alleged disability onset date (June 24, 2020), and 26 at the time of the ALJ's decision (September 15, 2021). Tr. at 41, 258. She is about five feet, three inches tall and weighs approximately 145 pounds. Id. at 251. Plaintiff completed one year of college in April 2019,[5] received no specialized job training, and worked in warehouses for Amazon and for a retailer. Id. at 47-48, 251-52. Plaintiff is single and lives with her

---

[5]Plaintiff explained that she left college when her father passed away, after which she "had a really hard time." Tr. at 47.

mother, two adult brothers, and Plaintiff's own son who was born four months before her December 2, 2021 administrative hearing.  Id. at 45.

At the hearing, Plaintiff testified that she worked preparing and shipping orders for Amazon but was fired in December 2019 due to "pulling out and having to leave because of my anxiety and panic attacks."  Tr. at 48-49.  She explained that she tried to return to similar work for a uniform company in June 2020, but she stopped after one week due to anxiety and panic attacks.  Id. at 47.  Her panic attacks make her feel like she is constantly going to faint, with lightheadedness, blurred vision, muffled hearing, overheating, shaking, and incontinence.  Id. at 50.  The panic attacks happen daily and randomly, and when they happen at home her mother or one of her brothers will sit and talk to her to keep her mind occupied.  Id. at 50-51.  If the panic attack worsens, she will "lay in a cold shower and try to calm myself down because I just -- my body feels like it's on fire."  Id. at 51.  Episodes can last an hour but sometimes last all night.  Id.

Plaintiff testified that she only sees her regular primary care physician for her panic attacks, who prescribes Sertraline daily and buspirone as needed.  Tr. at 51-52.[6] The medication keeps her more stable when at home.  Id. at 54.  She has gone to the hospital several times with chest pains and numbness and tingling down her arms and legs, and she has been kept overnight once for observation.  Id. at 53.  When asked why

---

[6]Sertraline (marketed as Zoloft) is a medication used for, among other things, depression, panic disorders, and social anxiety disorder.  See www.//drugs.com/sertraline.html (last visited Oct. 15, 2024).  Buspirone (phonetically spelled as "Fuzcone" in the hearing transcript, see tr. at 52) is an anti-anxiety medication. See www.//drugs.com/buspirone.html (last visited Oct. 15, 2024).

she has not sought mental health treatment, Plaintiff explained that a lot of providers were not accepting new patients during the COVID pandemic and that it is difficult for her to open up and talk to somebody.  <u>Id.</u> at 52, 53-54.

Plaintiff testified that the only thing she really takes care of at home is her room, although laundry can pile up for weeks when anxiety and depression make her not want to leave her room.  <u>Tr.</u> at 54-55.  She takes care of her baby "usually all day," although Plaintiff's mother will help when she has symptoms of a panic attack or when she gets "overwhelmed."  <u>Id.</u> at 55.  Plaintiff testified that she formerly did crafts 3 or 4 times per week to keep her mind occupied, "[b]ut since I've had [the] baby, I haven't really been able to more so because, you know, every time I try to do something, like, he starts to cry or something like that."  <u>Id.</u>  She sleeps very inconsistently and often wakes up in a state of panic, feeling like she cannot breathe, and will lie in a cold shower in the company of her mother until she calms down and cools off.  <u>Id.</u> at 56-57.[7]

At the hearing, a VE classified Plaintiff's prior work as warehouse worker or laborer stores, and as unskilled and medium exertional work, explaining that she performed the first job as light and the second as "just tapping into medium."  <u>Tr.</u> at 59-60.  Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, <u>see</u> <u>supra</u> at 4-5 (describing RFC), the VE testified that such an individual could not perform Plaintiff's past relevant work, <u>tr.</u> at 61, but could perform

---

[7]Plaintiff's testimony is generally consistent with the information provided in her Function Report, <u>tr.</u> at 261-68, and with a sworn statement by her boyfriend, Benjamin Gases, who worked with her at Amazon and witnessed her panic attacks.  <u>Id.</u> at 310-11.

other jobs that exist in significant numbers in the national economy, such as linen room attendant (a medium exertional job) and laundry folder and inspector for surgical instruments (both light exertional jobs).  Id. at 62.  In response to counsel's questions, the VE testified that the hypothetical individual would not be able to perform any work in the national economy if she were unable to complete an 8-hour workday, 5 days per week, would be absent from work for two days per month, or had a marked inability to interact with the public, supervisors, and co-workers.  Id. at 63-64.

C.    **Medical Evidence Summary**[8]

Plaintiff has a history of non-sustained ventricular tachycardia ("NSVT"),[9] palpitations, anxiety, and depression.  For example, Plaintiff sought emergency room treatment in November 2014 while experiencing palpitations with an associated history of syncope, nausea, and vomiting.  Tr. at 326.  Later that month, Plaintiff treated with her primary care physician, Rocco Costabile, M.D. for complaints of chest pain and tachycardia and reported two recent emergency room visits for chest pain and a recent syncopal episode.  Id. at 342.

At a visit with her cardiologist Daniel Vile, D.O., on March 12, 2020, Plaintiff complained of palpitations associated with lightheadedness, near fainting spells, chest

_____

[8]As Plaintiff's claims relate to the ALJ's consideration of Plaintiff's mental health impairments, the medical evidence summary will focus primarily on the mental health record.

[9]Tachycardia is defined as excessive rapidity in the action of the heart, Dorland's Illustrated Medical Dictionary, 32nd edition ("DIMD"), at 1867, and ventricular refers to one or both chambers of the heart known as ventricles.  Id. at 2048.

pressure, and left arm and leg numbness occurring randomly about twice per week. Tr. at

507. She stated that she previously took Cardizem[10] but had discontinued it on her own,

and that her anxiety was "well controlled with Zoloft." Id. The cardiologist listed

sertraline (Zoloft) as Plaintiff's only active medication. Id.

On July 9, 2020, Plaintiff treated with Dr. Costabile for complaints of panic

disorder and generalized anxiety disorder ("GAD"). Tr. at 521. Plaintiff reported that

she recently attempted to return to familiar prior work but had severe panic attacks, and

that she experienced waking up in a panic, tearfulness, shaking, diarrhea, vomiting, mood

swings, and agoraphobia, saying she had difficulty leaving home for any purpose. Id. A

review of symptoms found no chest pain or palpitations, no shortness of breath or

dyspnea on exertion, and no abdominal issues or incontinence. Id. Dr. Costabile

diagnosed panic attack, GAD, and insomnia, increased Plaintiff's dosage of sertraline,

and added buspirone for anxiety and panic attacks. Id. at 522. The doctor also

recommended that Plaintiff pursue psychotherapy in conjunction with medication to

improve her mental health status. Id.

Plaintiff returned to Dr. Costabile on September 15, 2020. Tr. at 523-24. The

doctor noted that Plaintiff exhibited poor eye contact and was tearful at times, with

normal thought process and content, and mild physical agitation. Id. at 524. Dr.

Costabile reiterated diagnoses of GAD, insomnia, and panic disorder with agoraphobia,

and noted no improvement in Plaintiff's anxiety/panic disorder despite an increase in her

---

[10]Cardizem is used to treat hypertension in adults. See
www.//drugs.com/cardizem.html (last visited Oct. 15, 2024).

medication dosage.  Id.  The doctor continued to recommend buspirone for Plaintiff's

panic attacks and that she seek out mental health therapy.  Id.

Also on September 15, 2020, Dr. Costabile completed a Third-Party Function

Report.  Tr. at 269-76.  The doctor indicated that he saw Plaintiff "several times per year"

beginning in 2011, and that the physical manifestations of her severe panic attacks and

anxiety "do not allow [Plaintiff] to be gainfully employed."  Id. at 269.  Dr. Costabile

indicated that Plaintiff has no problem with personal care, can prepare meals and perform

household chores, both indoors and outdoors, and can manage money.  Id. at 270-72.

Plaintiff goes outside several times weekly but does not drive or go out alone,

experiences fear of leaving the house and fear that her physical symptoms are a sign of

more than anxiety, and very infrequently engages in social activities, due to high anxiety.

Id. at 271-73.  The doctor reported that Plaintiff is fine with written or spoken

instructions, can pay attention for several minutes before getting distracted, gets along

with authority figures, and handles changes in routine normally, but she handles stress

poorly and that it leads to anxiety.  Id. at 274-75.  To support the statements made in the

Third-Party Function Report, Dr. Costabile attached his office treatment note from earlier

in the day.  Id. at 276 ("see attached office note"), 277-78 (9/15/20 office note).[11]

On October 12, 2020, Adrienne Gallo, Psy.D., performed a consultative mental

status evaluation of Plaintiff.  Tr. at 533-36.  Plaintiff reported that she stopped working

---

[11]The treatment note attached to the Third-Party Function Report, see tr. at 277-78, is a duplicate of the September 15, 2020 treatment note contained in Dr. Costabile's medical records.  See id. at 523-24.

due to anxiety and panic attacks and had been fired from other work attempts due to panic attacks.  Id. at 533.  She had no history of psychiatric hospitalizations or outpatient psychiatric treatment, and was receiving no current treatment.  Id.  Plaintiff reported difficulty falling asleep, frequent wakening, weight gain, dysphoric mood, crying, guilt, hopelessness, loss of interest, irritability, fatigue, diminished self-esteem, and concentration difficulties.  Id. at 534.  Her anxiety symptoms included excessive apprehension and worry, fatigue, irritability, fear of being judged, and difficulty concentrating; she had phobic responses to the dark, driving, and crowds; and she experienced trauma with flashbacks, hyperstartle response, nightmares, hypervigilance, avoidance, intrusive thoughts, and sleep disturbance.  Id.  Plaintiff's panic attack symptoms included palpitations, nausea, dizziness, breathing difficulties, trembling, numbness, and fainting, two -to- three times per week, randomly.  Id.  Her mental status examination showed anxious affect and mood, and otherwise yielded normal findings. Id. at 534-35.  Dr. Gallo diagnosed Plaintiff with unspecified depressive disorder, panic disorder, and post-traumatic stress disorder ("PTSD"), recommended individual psychological therapy and psychiatric intervention, and assessed her prognosis as "Guarded, given mild emotional disorder."  Id. at 536.

Dr. Gallo also completed a medical source statement of ability to work-related activities (mental).  Tr. at 537-39.  The doctor opined that Plaintiff's impairments did not affect her abilities to understand, remember, and carry out instructions, or to concentrate, persist, and maintain pace.  Id. at 537, 538.  Regarding her abilities to interact with others, Dr. Gallo opined that Plaintiff had marked limitation in her abilities to interact

appropriately with the public, supervisors, and co-workers, and no limitation in her ability to respond appropriately to usual work situations and changes in a routine work setting, and the doctor identified panic attacks with fainting as factors supporting her assessment.  Id. at 538.[12]

On October 20, 2020, state agency psychologist Paul T. Taren, Ph.D., performed a review of Plaintiff's mental health records and completed a Psychiatric Review Technique ("PRT") assessment as part of the initial disability determination.  Tr. at 71-73.  Dr. Taren opined that Plaintiff had medically determinable impairments in three categories -- depressive, bipolar, and related disorders; anxiety and obsessive-compulsive disorders; and trauma and stress-related disorders -- and that none of the impairments satisfied the diagnostic criteria of the Listings.  Id. at 71, 73.  Dr. Taren further opined that Plaintiff had mild limitation in the ability to understand, remember, or apply information, and moderate limitations in the abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself.  Id. at 71.  In an accompanying mental RFC assessment, Dr. Taren opined that Plaintiff had no understanding or memory limitations.  Id. at 76.  Regarding sustained concentration and persistence limitations, Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and was

---

[12]The form defined "marked" as "[f]unctioning in this area independently, appropriately, effectively, and or on a sustained basis is seriously limited."  Tr. at 537.

otherwise not significantly limited.  Id.  Regarding social interaction and adaptation limitations, Plaintiff was moderately limited in her ability to interact with the general public and to respond appropriately to changes in the work setting, but not otherwise significantly limited.  Id. at 76-77.  Dr. Taren concluded that Plaintiff could carry out no more than simple, routine tasks due to the limitations associated with her impairment, and was not disabled.  Id. at 77, 79.

On November 9, 2020, Plaintiff sought treatment at the emergency room of Holy Redeemer Hospital, with complaints of bleeding and cramping.  Tr. at 647-53.  Plaintiff reported that she had confirmed a pregnancy earlier in the week, and testing concluded that she had experienced a miscarriage.  Id. at 648, 653.  A psychiatric examination performed at the hospital was normal, including findings that Plaintiff was oriented to person, place, and time.  Id. at 649.

On November 12, 2020, Plaintiff returned to Dr. Costabile.  Tr. at 525-26 (repeated at 645-46).  Physical and mental examination yielded normal results, including thought process and content characterized as "normal and goal directed." Id. at 526.  The doctor continued Plaintiff on Zoloft for anxiety and buspirone for panic attacks.  Id.

On December 31, 2020, state agency psychologist Melissa L. Franks, Psy.D., completed a PRT assessment and mental RFC at the reconsideration stage, making the same findings as Dr. Taren did at the initial review stage.  Tr. at 87-88, 93-98.

On February 17, 2021, Plaintiff visited with Dr. Costabile with complaints of panic disorder and migraine headache.  Tr. at 640.  Plaintiff reported improvement in her anxiety and in waking up in a panic since being home and not working, and that she was

again pregnant.  Id.  The doctor noted that Plaintiff had ongoing difficulty leaving her home for any purpose, and ongoing severe agoraphobia with episodes of shaking, diarrhea, vomiting, and feeling faint.  Id.  Dr. Costabile diagnosed GAD, insomnia, panic disorder with agoraphobia, and migraine without aura, and added a prescription for sumatriptan[13] to take immediately with onset of migraine.  Id. at 641.

On April 1, 2021, Plaintiff had a follow-up visit with her cardiologist Dr. Vile, with complaints of palpitations mostly at night with dizziness and sometimes nausea.  Tr. at 751.  Plaintiff reported that she was three months pregnant and "her anxiety has been well controlled with Zoloft."  Id.  Following a physical examination, Dr. Vile diagnosed dizziness with lightheadedness and anxiety disorder, unspecified, continued her medications, ordered a heart monitor to rule out arrhythmia, and discussed eliminating caffeine intake.  Id. at 753.

On May 10, 2021, Plaintiff told Dr. Costabile that she felt her anxiety had been stable, with fewer episodes of panic attacks but ongoing difficulty leaving her home.  Tr. at 637.  The doctor characterized Plaintiff's anxiety as stable, continued her medications as prescribed (with reassurance that buspirone is safe during pregnancy), reiterated his recommendation for mental health treatment, and opined that Plaintiff is not capable of gainful employment.  Id. at 638.  On July 2, 2021, Plaintiff told Dr. Costabile that although her anxiety had been stable, she had "several recent higher anxiety scenarios"

---

[13]Sumatriptan (marketed as Imitrex) is used to treat migraine headaches.  See www.//drugs.com/sumatriptan.html (last visited Oct. 15, 2024).

including a panic attack related to a glucose tolerance test attempted by her obstetrician, and instances of waking up in a panic "on several occasions."  Id. at 625 (repeated at 784).  The doctor repeated his diagnoses and recommendations, and continued Plaintiff's medications.  Id. at 626.

Also on July 2, 2021, Dr. Costabile completed a medical source statement regarding Plaintiff's ability to do work-related activities (mental).  Tr. at 658-59.[14]  The doctor opined that Plaintiff has "no useful ability to function" in the abilities to maintain regular attendance and be punctual within customary tolerances, and to complete a normal workday and work week without interruptions from psychologically based symptoms; is "unable to meet competitive standards" in the ability to deal with normal work stress; is "seriously limited" in the abilities to sustain an ordinary routine without special supervision and to accept instructions and respond appropriately to criticism from supervisors; has "limited but satisfactory" abilities to remember work-like procedures, maintain attention for two-hour segments, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, interact appropriately with the general public, and respond appropriately to changes in a routine work setting"; and is

---

[14]The form Dr. Costabile used on this occasion, tr. at 658, contains different definitions than in the prior source statement the doctor completed.  Id. at 537.  The form asks for the medical provider's opinion of "your patient's ability to do work-related activities on a day-to-day basis in a regular work setting," with the following definitions: "Limited but satisfactory" means a noticeable difficulty no more than 10 percent of the workday or work week; "Seriously limited" means a noticeable difficulty from 11 to 20 percent of the workday or work week; "Unable to meet competitive standards" means a noticeable difficulty from 21 to 40 percent of the workday or work week; and "No useful ability to function" means the person "cannot perform the activity on a regular, reliable and sustained schedule in a regular work setting."  Id. at 658.

"unlimited or very good" in remaining abilities, including understanding, remembering, and carrying out short and simple instructions, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions, being aware of normal hazards, and adhering to basic standards of neatness and cleanliness.  Id. at 658.  Dr. Costabile added a qualification to his assessments, explaining that "all answers . . . would be 'no useful ability to function' in and around the time of a . . . panic attack."  Id. at 659.  The doctor further opined that on average, Plaintiff would absent from work more than three days per month due to her impairments or treatment.  Id.

On October 7, 2021, Plaintiff saw Laura Borthwick, M.D., for a gynecological visit following the birth of a baby boy on August 17, 2021.  Tr. at 778.  Plaintiff continued to take sertraline (Zoloft) and buspirone, id., and denied depression and palpitations during a review of symptoms.  Id. at 780.  Dr. Borthwick concluded that Plaintiff "[h]as recovered nicely physically and emotionally from the birth," with no sign of post-partum depression.  Id. at 781.

On November 3, 2021, Plaintiff returned to Dr. Costabile complaining of GAD, major depressive disorder ("MDD"), and panic disorder.  Tr. 782.  Plaintiff reported that her anxiety has been worse, with more frequent panic attacks and more depressive symptoms.  Id.  Plaintiff continued to have difficulty leaving her home and remained afraid to take buspirone despite the medication being prescribed and "recommended many times."  Id.  Dr. Costabile again recommended psychotherapy, but Plaintiff

16

reported her "insurance is a blockade."  Id. at 783.  The doctor diagnosed GAD, insomnia, panic disorder with agoraphobia, and moderate MDD, discontinued sertraline, and started Plaintiff on venlafaxine.  Id.[15]  Dr. Costabile also reviewed the disability evaluation made by Dr. Gallo, noting that he agreed with the doctor's finding of a marked impairment in Plaintiff's ability to interact with the public, supervisors, and co-workers, but disagreed with Dr. Gallo's finding of a mild emotional disorder, finding instead that Plaintiff "has severe panic disorder [with] agoraphobia, severe generalized anxiety, and moderate [MDD]."  Id.

### D.    Plaintiff's Claims

As noted, the ALJ found that Plaintiff could perform a full range of work at all exertional levels, with non-exertional limitations including simple, routine tasks; simple work-related decisions; no contact with the public; occasional contact with supervisors and co-workers; and occasional changes in the work setting.  Tr. at 9.  Plaintiff argues that the ALJ erred by (1) failing to mention a treating physician's opinion, (2) improperly evaluating the expert medical opinion evidence, and (3) failing to incorporate all of Plaintiff's limitations in her RFC assessment.  Doc. 7 at 4-29; Doc. 11 at 1-10.

### 1.    Failure to mention a treating physician's opinion

Plaintiff first alleges that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to mention the statements of Dr. Costabile, Plaintiff's treating physician, contained in the doctor's September 15, 2020 Third-Party Function

---

[15]Venlafaxine (marketed as Effexor) is used to treat MDD.  See www.//drugs.com/venlafaxine.html (last visited Oct. 15, 2024).

Report.  Doc. 7 at 4-8.  Defendant responds that the ALJ properly dismissed Dr.

Costabile's Third-Party Function Report, arguing that the statements contained therein

consist of issues reserved to the Commissioner and are therefore considered "inherently

neither valuable nor persuasive."  Doc. 8 at 7 (citing 20 C.F.R. § 404.1520b(c)).

"Statements on issues reserved for the Commissioner" are considered "inherently

neither valuable nor persuasive" and therefore the ALJ "will not provide any analysis

about how we considered such evidence."  20 C.F.R. § 404.1520b(c)(3).  This includes

"[s]tatements that you are not disabled [or] able to work."  Id. § 404.1520b(c)(3)(i).

Therefore, to the extent Dr. Costabile opined in the September 15, 2020 Third-Party

Function Report and attached treatment note that Plaintiff was unable "to be gainfully

employed," tr. at 269, the opinion was not entitled to any deference.  However, the ALJ

erred by dismissing the entirety of Dr. Costabile's Third-Party Function Report, without

indicating whether and to what extent any of the opinion evidence was considered.

The regulations define a medical opinion as "a statement from a medical source

about what you can still do despite your impairment(s) and whether you have one or

more impairment-related limitations of restrictions."  20 C.F.R. § 404.1513(a)(2).  As

previously summarized, Dr. Costabile stated in the Third-Party Function Report that

Plaintiff does not drive or go out alone, experiences fear of leaving the house and fear

that her physical symptoms are a sign of more than anxiety, very infrequently engages in

social activities due to high anxiety, and handles stress poorly and that it leads to anxiety.

Tr. at 272-75.  In his attached office note, Dr. Costabile reiterated diagnoses of GAD,

insomnia, and panic disorder with agoraphobia, and noted no improvement in Plaintiff's

anxiety/panic disorder despite an increase in her medication dosage.  Id. at 278.  The

doctor's statement qualifies as a medical opinion regarding Plaintiff's limitations and

restrictions in various areas of mental functioning, and therefore the ALJ's failure to

mention Dr. Costabile's Third-Party Function Report constitutes error.  See Mason v.

Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993) (ALJ "cannot reject evidence for no reason

or the wrong reason"). (quoting Cotter v. Harris, 642 F.2d 700, 702 (3d Cir. 1981)).

Moreover, the omission is not harmless because if the Third-Party Function Report were

to be properly considered, it may alter the ALJ's consistency and supportability analysis

of the expert medical opinion evidence as discussed in the next section.

## 2.    The ALJ's consideration of expert medical opinions

Plaintiff next alleges that the ALJ improperly evaluated the expert medical opinion

evidence by failing to properly credit the opinion of consultative examining psychologist

Dr. Gallo and improperly rejecting the opinion of treating physician Dr. Costabile.  Doc.

7 at 9-22.  Defendant responds that the ALJ properly considered the medical expert

opinions.  Doc. 8 at 8-15.

Consideration of evidence is governed by regulations, in effect since March 27,

2017, that focus on the persuasiveness of each medical opinion.[16]  "We will not defer or

give any specific evidentiary weight, including controlling weight, to any medical

opinion(s) or prior administrative medical finding(s), including those from your medical

_____

[16]In contrast, the regulations governing applications filed before March 17, 2017,
spoke in terms of the weight to be given each opinion, including controlling weight for
the opinions of certain treating sources.  20 C.F.R. § 404.1527.

sources." 20 C.F.R. § 404.1520c(a).  The regulations list the factors to be utilized in considering medical opinions:  supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain how he considered these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence [she] rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  Additionally, when there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason." Rutherford, 399 F.3d at 554 (quoting Mason, 994 F.2d at 1066); see also Plummer, 186 F.3d at 429 (same).

In addressing the medical opinion evidence related to Plaintiff's mental health impairments, the ALJ stated:

> In October 2020, the State agency's psychological consultant at the initial level, [Dr. Taren], opined that [Plaintiff] has mild difficulty with understanding, remembering, or applying information; and moderate difficulty with interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself; [Plaintiff] demonstrates adequate social and self-advocacy skills; and she is able to

understand, recall, and carry-out simple instructions. In December 2020, the State agency's psychological consultant at the reconsideration level, [Dr. Franks], affirmed Dr. Taren's opinion and stated that [Plaintiff] is able to understand, retain and apply information; concentrate, persist, and maintain pace in order to complete . . . tasks; adapt and manage herself; and manage, understand, and complete simple one or two-step tasks. I find these opinions persuasive because they are supported by the medical evidence in the record and they are generally consistent with the record as a whole. [Plaintiff's] treatment notes reflect that she was prescribed psychotropic medication by her primary physician, which was helpful to her symptoms; however, [Plaintiff] failed to treat with a psychiatrist [or] psychologist despite be[ing] recommended by her primary care physician.

In October 2019, the consultative examiner, [Dr. Gallo], opined that [Plaintiff's] ability to understand, remember and carry-out instructions are not affected by her impairments; and she has no difficulty with responding appropriately to work situations and to changes in a routine work setting. However, Dr. Gallo opined [Plaintiff] had marked difficulty with interacting with the public, supervisors, and co-workers. [Plaintiff's] primary care physician, [Dr. Costabile], states that he agrees with Dr. Gallo that [Plaintiff] has marked difficulty with interacting with the public, supervisors, and co-workers, but disagree[s] with him that [Plaintiff] has a mild emotional disorder. I do not find these opinions persuasive because they are not supported by the medical evidence, or consistent with the record as a whole. First, in the Function Report, [Plaintiff] reported that she has no problems getting along with family, friends, neighbors and others; and she has never been fired or laid-off from a job because of problems getting along with other people. Moreover, [Plaintiff's] treatment notes reflect that she has a cooperative attitude.

In July 2021, [Dr. Costabile] opined that [Plaintiff] has unlimited or very good ability to understand, remember and carry-out short and simple instructions; work in coordination with and [in] proximity with others without being distracted by them; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length

of rest periods; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and adhere to basic standards of neatness and cleanliness. She has limited, but satisfactory ability to remember work-like procedures; maintain attention for two-hour segments; get along with co-workers or peers without distracting them or exhibit[ing] behavior extremes; interact with the general public; and respond appropriately to changes in a routine work setting. She has seriously limited ability to sustain an ordinary routine without special supervision and accept instructions and respond appropriately to criticism [from] supervisors. She is unable to meet competitive standards to deal with normal work stress; and she has no useful ability to function to maintain regular attendance and be punctual . . . or complete a normal workday and workweek without interruptions from psychologically-based symptoms. I do not find this opinion persuasive because it is not supported by the medical evidence in the record, or consistent with the record as a whole. Dr. Costabile is [Plaintiff's] primary care physician, and as such, does not specialize in mental health disorders. [Plaintiff's] treatment notes also reflect that she was prescribed psychotropic medication by Dr. Costabile, which was helpful with her symptoms; however, [Plaintiff] failed to treat with a psychiatrist or psychologist despite being recommended by Dr. Costabile to do so. In addition, she has had no hospitalization due to her mental [health issues].

Tr. at 12-13 (citations to exhibits omitted).

There are three problems with the ALJ's discussion of the opinion evidence, which together skewed her consideration of the consistency and supportability of the opinions of Drs. Costabile and Gallo. The first problem is that in finding the doctors' opinions to be unpersuasive, the ALJ relied in part on evidence showing that Plaintiff had a cooperative attitude and got along well with others, thereby suggesting that the doctors mischaracterized or exaggerated Plaintiff's mental impairments. This analysis reveals a misunderstanding of Plaintiff's claimed impairments. Plaintiff does not allege that she

has oppositional or defiant behavioral disorders, or that she lost her jobs due to conflicts with others.  Rather, she experiences severe anxiety and panic attacks in social situations, accompanied by shaking, diarrhea, feelings of faintness, and agoraphobia which make it difficult for her to leave her home.  Thus, the ALJ discounted the opinions of Drs. Costabile and Gallo in part based on a mischaracterization of the evidence regarding the nature of her mental impairments, including when and how they manifest.

The second problem is that in finding the opinions of Drs. Costabile and Gallo to be unpersuasive, the ALJ also ignored important record evidence.  For example, whereas the ALJ noted that Plaintiff had never been fired or laid-off due to problems getting along with other people -- an observation which Plaintiff does not contest for the reason just explained -- the ALJ ignored evidence that Plaintiff had been fired from her job at Amazon because she left her workplace due to episodes of anxiety and panic attacks. See, e.g., tr. at 277 (9/15/20, Plaintiff reported to Dr. Costabile that she "was working for Amazon and was fired for missing so much time due to panic attacks"), 48-49 (Plaintiff testified that she fired from Amazon in December 2019 due to her anxiety and panic attacks), 47 (Plaintiff testified that her attempt to return to familiar work lasted only one week because she "started having really bad anxiety and panic attacks, and I couldn't go back.").  The ALJ also summarily dismissed a sworn statement submitted by Plaintiff's boyfriend, Mr. Gases, id. at 14, without at least noting that Mr. Gases' statement corroborated Plaintiff's testimony, Plaintiff's Function Report, and the opinions of Drs. Costabile and Gallo regarding the nature and extent of Plaintiff's anxiety and panic

attacks.  See id. at 310-11 (statement of Mr. Gases describing Plaintiff's panic attacks and their impact on her daily life).

The third problem regarding the ALJ's consideration of the opinions of Drs. Costabile and Gallo is that the ALJ relied in part on Plaintiff's failure to seek psychiatric treatment as recommended by the doctors, without considering whether Plaintiff had acceptable reasons for not obtaining such treatment.  The regulations require that a claimant follow recommended treatment, and that a failure to do so "without a good reason" will result in the denial or termination of benefits.  20 C.F.R. § 404.1530(a), (b).  The regulations further provide that in determining whether a claimant has "acceptable reasons" for not following prescribed treatment, "[w]e will consider your physical, mental, educational, and linguistic limitations."  Id. § 404.1530(c).[17]  Here, the ALJ did not consider whether Plaintiff's social anxiety and/or panic disorders are themselves the cause of her failure to seek recommended treatment, as for example when asked why she had not sought mental health treatment, Plaintiff testified that it was due to COVID and related insurance issues, and that it is difficult for her to open-up and talk to somebody.  Tr. at 52, 53-54.  What may seem like an excuse for inaction in most individuals may, in the context of a person with severe impairments of depressive disorder, anxiety disorder, and panic disorder, rise to the level of an "acceptable reason" for failing to enter

---

[17]The regulation provides a non-exhaustive list of "examples" of good reasons for not following treatment, although none of the specific examples relate to the "mental . . . limitations" which must be considered in determining whether a claimant has "acceptable reasons" for not following prescribed treatment.  20 C.F.R. § 404.1530(c)(1)-(5).

psychotherapy.  See, e.g., Tobin v. Comm'r of Soc. Sec., Civ. No. 19-12810, 2020 WL

4218396, at *6 (D.N.J. July 23, 2020) (remanding where ALJ failed to consider whether

the claimant's non-compliance with treatment was caused by mental impairments).[18]

Importantly, had the ALJ properly addressed the record with regard to the issues

identified above, the opinions of Drs. Costabile and Gallo become far more consistent

and supported by the record.  For example, Dr. Costabile opined that Plaintiff has "no

useful ability to function" in the abilities to maintain regular attendance and be punctual

within customary tolerances, and to complete a normal workday and work week without

interruptions from psychologically based symptoms; is "unable to meet competitive

standards" in the ability to deal with normal work stress; and is "seriously limited" in the

abilities to sustain an ordinary routine without special supervision and to accept

instructions and respond appropriately to criticism from supervisors.  Tr. at 658.  The

doctor added that these and all other assessed abilities "would be 'no useful ability to

function' in and around the time of a . . . panic attack," and that Plaintiff would be absent

from work more than three days per month due to her impairments or treatment.  Id.  at

659.  Dr. Gallo opined that Plaintiff had marked limitation in her abilities to interact

appropriately with the public, supervisors, and co-workers, and identified panic attacks

---

[18]In a related problem, the ALJ discounted the limitations found by Dr. Costabile
for the additional reason that Plaintiff has never been psychiatrically hospitalized.  Tr. at
13.  Although a hospitalization may be probative of the severity of an impairment, it  is
not required by the Listings or to show an RFC assessment incompatible with sustained
work.

with fainting as factors supporting her assessment.  Id. at 538.[19]  Drs. Costabile and Gallo noted similar symptom reports by Plaintiff, made similar anxiety-related findings on examination, and made similar diagnoses, all of which are largely consistent with, and supported by, the longitudinal medical record and Plaintiff's testimony and Function Report.  Finally, although Defendant argues that the ALJ properly discounted Dr. Costabile's opinions because the doctor lacked psychiatric specialization, Doc. 8 at 13-14, the ALJ similarly discounted the opinions of Dr. Gallo, despite her specialization in psychology.

For the aforementioned reasons, I find that ALJ's consideration of the medical expert opinion evidence is not supported by substantial evidence.  Upon remand, the ALJ shall reconsider the nature and extent of Plaintiff's mental impairments, including whether she had an acceptable reason for not following prescribed treatment, and obtain additional expert medical opinion evidence, if deemed necessary.

### 3.     The ALJ's RFC assessment

Plaintiff next argues that the ALJ failed to incorporate into her RFC assessment the moderate limitation the ALJ found in Plaintiff's ability to concentrate, persist, or maintain pace.  Doc. 7 at 22-29.  Defendant responds that this aspect of the ALJ's decision is supported by substantial evidence.  Doc. 8 at 15-18.

---

[19]As previously noted, Dr. Costabile agreed with Dr. Gallo's finding of a marked impairment in Plaintiff's ability to interact with the public, supervisors, and co-workers, but disagreed with Dr. Gallo's finding of a mild emotional disorder, finding instead that Plaintiff "has severe panic disorder with agoraphobia, severe generalized anxiety, and moderate [MDD]."  Tr. at 783.

Because I recommend that this matter be remanded for proper consideration of the impact of Plaintiff's anxiety and/or panic disorder, I will only briefly address Plaintiff's RFC issue. The RFC assessment is the most a claimant can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe. Id. § 404.1545(a)(2). However, the ALJ is not required to include every impairment a clamant alleges. Rutherford, 399 F.3d at 554. Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*." Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984), and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)); Plummer, 186 F.3d at 431. The ALJ must include all credibly established limitations in the RFC and in the hypothetical posed to the VE. Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) (citing Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Here, Plaintiff argues that the ALJ failed to incorporate into her RFC assessment any limitation corresponding to the ALJ's finding of moderate limitation in concentration, persistence, and pace. Doc. 7 at 23 (citing tr. at 8). I disagree with Plaintiff on this point. In her RFC assessment, the ALJ limited Plaintiff to, among other things, simple, routine tasks and simple work-related decisions, and explained the basis for the limitations. Tr. at 9. The Third Circuit has held that a limitation to "simple tasks" is sufficient to convey a moderate limitation in concentration, persistence and pace, when accompanied by adequate explanation. Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 211-

12 (3d Cir. 2019); see also Weaver v. Saul, Civ. Action No. 18-3295, 2019 WL 4220927, at *1 n.1 (E.D. Pa. Sept. 5, 2019) (applying Hess to conclude a limitation to unskilled work was sufficient to account for a moderate limitation in concentration, persistence and pace).[20]

Nevertheless, the ALJ's step five determination is flawed because although the ALJ limited Plaintiff to simple, routine tasks and simple work-related decisions, tr. at 9, the Dictionary of Occupational Titles ("DOT") provides that two of the jobs identified by the VE (laundry folder, DOT 369.687-018, 1991 WL 673072; inspector for surgical instruments, DOT 712.684-050, 1991 WL 679243) require a Reasoning Level of 2, and the third job (linen room attendant, DOT 222.387-030, 1991 WL 672098) requires a Reasoning Level of 3. Tr. at 15, 62. Reasoning Level 2 requires the ability to carry out "detailed" instructions, and Reasoning Level 3 requires the ability to "carry out instructions furnished in written, oral, or diagrammatic form." DOT App. C., 1991 WL 668702. As a result, there may be a conflict between Plaintiff's abilities as determined by the ALJ and the job requirements as identified by the VE and adopted by the ALJ. See, e.g., Minichino v. Colvin, 955 F.Supp.2d 366, 387 (M.D. Pa. 2013) (limitation precluding ability to perform "detailed" instructions is consistent with only Reasoning Level 1 jobs). Therefore, on remand the ALJ shall revisit her findings at step five and obtain additional VE testimony, if deemed necessary.

---

[20]Unskilled work is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

**IV.    <u>CONCLUSION</u>**

The ALJ's decision is not supported by substantial evidence.  The ALJ failed to consider a medical opinion from a medical source and erroneously assessed the medical opinion evidence.  On remand, the ALJ shall reconsider the nature and extent of Plaintiff's mental impairments, including whether she had an acceptable reason for not following prescribed treatment, and obtain additional expert medical opinion, if deemed necessary.  Also on remand, the ALJ shall also revisit her findings at step five and obtain additional VE testimony, if deemed necessary.

An appropriate Order follows.